# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIO J. SEGRETI          )
    Plaintiff          )
              )
v.          )          Case No. 1:07-cv-00287-RBW
              )
A. MARK CHRISTOPHER, et al.          )

## MOTION TO DISMISS AMENDED COMPLAINT
## PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)

Defendants A. Mark Christopher, Herge, Sparks & Christopher, LLP, Vaughan, Fincher

& Sotelo, P.C., and J. Curtis Herge, by counsel, move this Court to dismiss Plaintiff's Amended

Complaint for failure to state a claim.  The grounds in support of this Motion are set forth more

fully in the accompanying Memorandum in Support.

Pursuant to LCvR 7(f), a hearing on this matter is requested.

Dated: April 30, 2007          Respectfully submitted,

SANDS ANDERSON MARKS & MILLER
A Professional Corporation


/s/ George O. Peterson
_____
J. Jonathan Schraub     (DC Bar No. 950816)
George O. Peterson     (DC Bar No. 478050)

1497 Chain Bridge Road
Suite 202
McLean, Virginia  22101
(703) 893-3600
(703) 893-8484 (facsimile)
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April, 2007, a true and correct copy of the foregoing Defendants A. Mark Christopher, Herge, Sparks & Christopher, LLP, Vaughan, Fincher & Sotelo, P.C., and J. Curtis Herge's Motion to Dismiss Amended Complaint and Memorandum in Support were served, by ECF upon:

> Ashley E. Wiggins, Esquire
> Griffin & Murphy, LLP
> 1912 Sunderland Place, N.W.
> Washington, D.C. 20036
> *Co-Counsel for Plaintiff*

*And by U.S. Mail to:*

> J. Gordon Forester, Jr., Esquire
> Law Offices of J. Gordon Forrester, Jr.
> 1912 Sunderland Place, N.W.
> Washington, D.C. 20036
> *Co-Counsel for Plaintiff*

> /s/ George O. Peterson
> _____
> George O. Peterson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARIO J. SEGRETI** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Case No. 1:07-cv-00287-RBW** |
| | ) | |
| **A. MARK CHRISTOPHER, et al.** | ) | |

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. RULE 12(b)(6)

Defendants A. Mark Christopher, Herge, Sparks & Christopher, LLP, Vaughan, Fincher & Sotelo, P.C., and J. Curtis Herge, by counsel, file this Memorandum in Support of Their Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. Rule 12(b)(6), and state as follows:

## I.      INTRODUCTION

Plaintiff Mario J. Segreti's ("Mr. Segreti") legal malpractice lawsuit against attorney A. Mark Christopher ("Mr. Christopher") and the other Defendants is premised on a factual allegation that he had an agreement with his grandmother Marguerite Corsetti ("Mrs. Corsetti") to transfer real property located at 5113 Western Avenue, N.W., Washington, D.C. ("Property") to him.

Mr. Segreti, however, fully litigated the existence of the alleged agreement in D.C. Superior Court – Probate Division during a trial that took place between February 27, 2006 through March 23, 2006. See Mario J. Segreti v. Luke De Iuliis, Adm. No. 652-04 ("Probate Matter"). The Honorable Jose M. Lopez issued an extensively detailed, twenty-nine page opinion finding that **no such agreement existed**. See Memorandum Order from Probate Matter

dated October 16, 2006, attached as Exhibit 1.[1]  Judge Lopez notably found Mr. Segreti lacked candor and credibility as to Mrs. Corsetti's alleged agreement to transfer the Property to him. See ¶ 46 of the Memorandum Order ("[d]ue to his strained efforts, Mario's testimony seldom was sincere...  He seemed overzealous to provide a rationale for everything to the point of giving an impression that he was trying to color the facts to suit his picture of the truth.")

Mr. Segreti now sues Mr. Christopher, et al., alleging that Mr. Christopher was negligent in failing to advise him and Mrs. Corsetti with respect to the alleged agreement to transfer the Property which the D.C. Superior Court has already determined did not exist.  Mr. Segreti further alleges that Mr. Christopher acted in a conflict of interest when Mrs. Corsetti executed a new Last Will and Testament ("Will") and an Amended and Restated Revocable Trust Agreement ("Trust") on March 2, 2004 which excluded Mr. Segreti from her estate planning thereby frustrating the alleged agreement the D.C. Superior Court has determined did not exist.

Mr. Segreti is – quite simply – collaterally estopped from asserting that there was ever any agreement between him and Mrs. Corsetti to transfer the Property since that issue was already litigated and lost in the Probate Matter.  Without the ability to support a factual allegation, Mr. Segreti simply cannot show a breach of duty on the part of Mr. Christopher or a causal link between anything Mr. Christopher may have done and any damages.  Accordingly, this Court should dismiss this lawsuit with prejudice.

---

[1]     Mr. Segreti noted an appeal of the Memorandum Order, but an appeal does not bar the doctrine of collateral estoppel from precluding the present suit.  See Southern Pacific Communications Co. v. American Tel. & Tel. Co., 740 F.2d 1011, 1018, 238 (D.C. Cir. 1984) ("We note that the federal rule and the rule in this circuit is that collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal.")

## II.     FACTS

### A.     FACTS ALLEGED IN AMENDED COMPLAINT

Mr. Segreti alleges that Mr. Christopher prepared Mrs. Corsetti's tax returns throughout the 1990s through her death on March 24, 2004. Amended Complaint, ¶ 13. During that time, Mr. Segreti resided at the Property with his grandmother, Mrs. Corsetti. Amended Complaint, ¶ 15.

Mr. Segreti alleges that in the early 1990s, he and Mrs. Corsetti "jointly sought legal assistance" from Mr. Christopher "to effectuate an inter vivos transfer of title of the Property from Mrs. Corsetti to [Mr. Segreti] either by gift or at a discounted price." Amended Complaint, ¶ 16. Mr. Segreti alleges that Mr. Christopher advised him and Mrs. Corsetti not to make the proposed transfer during Mrs. Corsetti's lifetime, but instead transfer the title to the Property upon Mrs. Corsetti's death so as to receive more favorable tax treatment. Amended Complaint, ¶ 17.

Mr. Segreti alleges that he and Mrs. Corsetti relied upon Mr. Christopher's advice and "decided to effectuate the transfer of title to the Property through Mrs. Corsetti's estate upon her death." Amended Complaint, ¶ 21. Mr. Segreti alleges that Mr. Christopher failed to advise him that "unlike an immediate transfer of title to the Property", transferring title of the Property to him "through testamentary devise would not be binding on Mrs. Corsetti without a written contract to make a will." Amended Complaint, ¶ 22.[2] Mr. Segreti alternatively asserts that he is a third-party beneficiary to the services Mr. Christopher, et al. rendered to Mrs. Corsetti. Amended Complaint, ¶ 41.

---

[2]     Mr. Segreti's allegation as to the state of the law is incorrect. Oral contracts to make a will are binding. Judge Lopez, however, specifically found that no such agreement ever existed.

3

While Mrs. Corsetti executed a will and trust in 1997 in which she left the Property to Mr. Segreti at that time, Mrs. Corsetti executed a new Will and Trust on March 2, 2004 which omitted Mr. Segreti.  See Amended Complaint, ¶¶ 23-29.  Mr. Christopher participated in both sets of estate planning documents.  Mr. Segreti alleges that Mr. Christopher failed to advise or consult him about Mrs. Corsetti's revised 2004 Will and Trust nor sought his consent to represent Mrs. Corsetti in drafting her Will and Trust.  See Amended Complaint, ¶¶ 30-31.

Mr. Segreti further alleges that Mr. Christopher served as an "expert witness" in a preliminary injunction hearing and the "probate matter" challenging the validity of the Will and Trust.  See Amended Complaint, ¶¶ 34-37.  Mr. Segreti alleges that this was a conflict of interest.  See Amended Complaint, ¶¶ 39-40.[3]

## B.    ADVERSE JUDGMENT AGAINST MR. SEGRETI IN THE PROBATE MATTER

As set forth above, Mr. Segreti fully litigated and lost the issue of whether or not he ever had an agreement with Mrs. Corsetti to transfer title to the Property to him.  Judge Lopez addressed this contention in an extensive and detailed Memorandum Order.  For ease of this Court's consideration, excerpts of the pertinent parts of the Memorandum Order are set forth below:

[Opening Paragraph, Page 1.]  Three issues were before the Court: (1) whether

Mrs. Marguerite L. Corsetti lacked testamentary capacity to execute the will and

---

[3]     While not presently before this Court, it should be noted that Mr. Segreti's counsel never objected to Mr. Christopher testifying as a witness in any of the underlying proceedings based upon an alleged conflict of interest and thereby waives any claim as to this issue.  Mr. Christopher's testimony was largely in the capacity as a fact witness and the only "expert" testimony he gave was related to the estate planning and probate process.  Moreover, Judge Lopez' Memorandum Order is not predicated, in the least, on any "expert" testimony provided by Mr. Christopher.  See Memorandum Order, ¶¶ 20-29 summarizing Mr. Christopher's testimony and not referencing any testimony as an expert witness.

the trust on March 2, 2004; (2) whether she was unduly influenced by Luke De Iuliis, Marie A. Arient and Antoinette Witt to execute those instruments and to change the co-ownership of her Bank of America account; and (3) **whether she had an oral/written contract with Mario J. Segreti to make a will leaving him her house.**

¶ 6.    Under the will of 1993, Mrs. Corsetti devised her property, including her house, among her children, *per stirpes.*

¶7.    Under the 1997 Will, executed in the law office of John F. Wolf, Jr., Mrs. Corsetti devised the house and its contents to Mario.  She gave her other grandsons, Justin and Damian Corsetti, $5,000.00 each, her daughters, Anita Segreti and Marie Arient, $100.00 each, and split the residue among her other daughter Antoinette Witt and her grandchildren Mario and Rose Marie Beckner.

¶8.    Under the 2004 Will executed on March 2, 2004, Mrs. Corsetti made provisions to pour her estate, other than some tangible personal property, into the Trust.  The house was conveyed to the Trust on March 12, 2004.  And as amended and restated on March 2, 2004, the Trust is to distribute the trust assets, including the house, after Mrs. Corsetti's death, among such issues *per stirpes*.  In addition, on February 26, 2004, Ms. Corsetti removed Mario as a joint co-owner on her Bank of America account and replaced him with Luke and Marie Arient.  Previously, she had Luke, then Anita and Mario Segreti, before changing to just Mario as a co-owner on the account.

¶ 27.    After Mrs. Corsetti's passing, in a March 31, 2004 letter admitted into evidence, Mario said to his uncle Luke, "It is a known fact that all of my

grandmother's property including the house at 5113 Western Ave., N.W., is now owned by the 'Marguerite L. Corsetti Trust.' It does not belong to her heirs, and therefore the trustees have full discretion as to who resides there and to the disbursements of any and all property." Mario's explanation that the letter was part of a settlement effort to enforce a "deal" he had with his grandmother was just not credible.

¶28. **Mario testified to having filed an affidavit stating that in 1992 he entered into a "verbal agreement" with Mrs. Corsetti.** He said that in 1992, he and his grandmother had a series of conversations about his grandmother not wanting to be alone, and about the fact that [sic] that there was no one to maintain her house. He told his grandmother that if he were going to put in so much work into a house, he would rather that the efforts went into his own house. So they talked about his purchasing Mrs. Corsetti's house for $200,000 over ten years, and that he would put work into the house. The purchase did not take place because they learned from attorney Christopher that they would have a lower tax liability if Mario were to get the house by bequest and take the property at a step-up basis. When asked about a meeting discussing Mrs. Corsetti's 1993 will that bequeathed her house to others, Mario said that he deliberately left that meeting because he did not want to be a part of it; as Mario explained, that was because in 1993 he and his grandmother were still discussing the details of their agreement.

¶ 29. Then in 1997, Mario said that he told his grandmother that he was moving on because he had not seen anything in writing about what they talked about in 1993. **Mario testified that Mrs. Corsetti was upset about his intent to leave.**

Consequently, Mario said, Mrs. Corsetti consulted Mr. Wolf, then Mr. Christopher, and executed the 1997 Will wherein the house was now devised to him in return for the promises he "already made", which, according to him, was to continue doing what he was doing for her, for the house, and for the promise of not letting anyone take her out of the house to a nursing home.

¶ 32.    **Mario put on several witnesses in support of the "deal" between he and his grandmother.**

¶ 46.    **Due to his strained efforts, Mario's testimony seldom was sincere.**  In his testimony, Mario frequently went off on explanations of things that were not asked by either his counsel or the opposing counsel.  **He seemed overzealous to provide a rationale for everything to the point of giving an impression that he was trying to color the facts to suit his picture of the truth.**  He said he did not know about needing a written contract to make a will, yet his history was anything but that of someone who is naïve about business dealings.  He had negotiated a sale contract of a farm as far back as 1997 and had dealings with attorney Wolf on other matters even before that, which all begs the question of why he did not consult an attorney if in fact he was unfamiliar with the need to get a deal in writing.  While it may be that in the nature of family affairs business formalities often take a back seat; this family is far different.  Mario contends that the 1997 will represents the formality of a business transaction.  In making this assertion, Mario reveals his failing.  All indications are that this family is more sophisticated than others who would permit something like the 1997 Will to be a tacit contract to will a piece of property.  **The evidence overwhelmingly suggests**

that if the 1997 Will were intended to be part of an agreement, it would have been spelled out in that will.

¶ 68.  **Instead, Mario needs to overcome the presumption, by a preponderance of the evidence, that there was a contract implied in fact between him and his grandmother.**

¶ 69.  **We need not apply the "substantially more credible" corroboration test that the District's dead man statute requires, and we need not apply the "clear and convincing" test that a claim of oral contract to make a will ordinarily requires.  For the evidence in this case is not sufficient to overcome the lowest burden of proof by a preponderance of the evidence that the decedent, Marguerite L. Corsetti, and the plaintiff, Mario J. Segreti, had an implied contract for services, so there cannot be an oral contract to make a will.**

¶ 76.  **Perhaps at times Mrs. Corsetti felt magnanimous to give Mario a part of the house, but it was an act out of her own volition rather than an act to fulfill a contractual obligation.**  Mario's witnesses testified that Mrs. Corsetti "wanted" to give the house to him, and that Mrs. Corsetti has said that it would be a "right thing" for her to give Mario the house for the many years he stayed with her.  **Their testimony lends support to a belief that Mrs. Corsetti herself contemplated giving the house to Mario, and not because she had a contract to do so.**

¶ 77. **Mario may very well have believed that he was to get the house for his efforts, but his belief alone cannot be imputed on Mrs. Corsetti** .... He said he had asked Mrs. Corsetti to put their agreement in writing, yet there was none.

¶ 79. **Mario's hurdles are insurmountable, he was not able to satisfy the Court that by a preponderance of the evidence he rendered services to his grandmother that were not of a gratuitous nature but rather a contract for remuneration.** Yet had he met this showing, there is his failure to show by clear and convincing evidence that it was a contract for the specific performance that Mrs. Corsetti would devise her house to him alone.

¶ 82. **Accordingly, the Court finds no evidence that Mrs. Marguerite Corsetti breached an oral contract to will her house to Mario Segreti.** The Court finds that there was no agreement between Mrs. Corsetti and Mario whereby Mario was to render services in exchange for Mrs. Corsetti's promise to will her entire house to him.

[Memorandum Order, Page 29.]

**<u>JUDGMENT</u>**

For the forgoing reasons, it is hereby ORDERED that:

...

Plaintiff, Mario Segreti, and the deceased, Marguerite Corsetti, **did not have an oral or written contract to will the real property located on 5113 Western Avenue, N.W., Washington, DC;**

...

(emphasis added).

9

III.    ARGUMENT

A claim must be dismissed under Fed. R. Civ. P. 12(b)(6) where it is clear "'that the [complaining party] can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Major v. Plumbers Local Union No. 5</u>, 370 F. Supp. 2d 118, 123 (D.D.C. 2005) (Bates, J.) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). Although a plaintiff need not set forth a prima facie case as to a claim to survive a 12(b)(6) motion, he or she "must present facts that would establish the elements of each claim." <u>Id.</u> at 128. And when evaluating a motion to dismiss, well-pled allegations must be taken as true, but "[c]onclusory legal and factual allegations . . . need not be considered." <u>Id.</u> at 123.

This Court may also take judicial notice of Judge Lopez's Memorandum Order for the purposes of determining a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). <u>Howard v. Gutierrez</u>, 474 F.Supp.2d 41, 47-48 (D.D.C. 2007) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated herein, and matters of which it may take judicial notice.") <u>Stewart v. Nat'l Educ. Ass'n</u>, 471 F.3d 169, 173 (D.C. Cir. 2006); <u>see</u> <u>also</u> <u>Opoka v. INS</u>, 94 F.3d 392, 394 (7th Cir.1996) ('Indeed, it is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice.'); <u>Marshall County Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1222 (D.C. Cir. 1993) ('The district court may ... examine matters of public record in ruling on a Rule 12(b)(6) motion...'). Mr. Segreti specifically references the Probate Matter in his Amended Complaint and this Court should take judicial notice of that proceeding for the purposes of deciding this Motion. <u>See</u> Amended Complaint, ¶ 37.

A.   **Mr. Segreti's Claim is Barred By Collateral Estoppel Because He Cannot Re-Litigate the Issue of Whether Mrs. Corsetti Ever Agreed to Transfer the Property to Him.**

The fundamental problem with Mr. Segreti's claim against Mr. Christopher, et al., is that he is collaterally estopped from asserting that he and Mrs. Corsetti ever had an agreement to transfer the Property to him. Judge Lopez's Memorandum Opinion clearly demonstrates that this factual issue was litigated and decided adversely to Mr. Segreti in the underlying Probate case.

Collateral estoppel, in its traditional form, precludes a party from litigating an issue if (1) the same issue was contested by the parties and submitted for judicial determination in a prior case; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in a prior case; and (3) preclusion in the second case would not work a basic unfairness on the party bound by the decision in the first case. See Pharmaceutical Care Management Ass'n v. District of Columbia, 2007 WL 666319, *4 (D.D.C. 2007).[4]

While Mr. Christopher, et al. were not parties to the Probate Matter, they may nevertheless assert the defensive form of collateral estoppel. See U.S. v. Mendoza, 464 U.S. 154, 159, n. 4 (1984), citing Parklane Hosiery Co. v. Shore, 439 U.S. 322 , 326, n. 4 (1979); see also Bryson, 268 F.Supp. 2d at 57 ("The assertion of non-mutual defensive collateral estoppel is also permitted by local law.  Jackson v. District of Columbia, 412 A.2d 948, 952-53

---

[4]   Collateral estoppel is applicable when the issues are sufficiently similar and material to justify imposition of the doctrine. Bryson v. Gere, 268 F.Supp. 2d 46, 57 (D.D.C. 2003) ("The most difficult question in this analysis is whether the issues which are now asserted by plaintiffs are **substantially similar** to those issues which were adjudicated and decided in arbitration.") (emphasis added); U.S. v. Kendrick, 98 Fed.Appx. 692, 693-694 (9th Cir. 2004), citing United States v. McLaurin, 57 F.3d 823, 826 (9th Cir.1995) ("We determine whether collateral estoppel applies using a three-step process:  (1) An identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was "litigated" in the first case; and (3) an examination of the record in the prior proceeding to ascertain whether the issue was necessarily decided in the first case.")

(D.C.1980).")[5]  In this case, all elements of the doctrine of collateral estoppel are met and Mr.

Segreti's claim should be dismissed with prejudice.

**1.    Same Issue Necessary For Mr. Segreti to Prove His Case Here Was Decided Adversely to Him in the Probate Matter.**

Mr. Segreti brought the issue of whether Mrs. Coresetti ever agreed to transfer the

Property to him before the D.C. Superior Court in the Probate Matter, fully litigated the issue,

and lost.  See the third issue addressed by Judge Lopez in the Memorandum Order ("(3) **whether**

**she had an oral/written contract with Mario J. Segreti to make a will leaving him her**

**house.**").   After hearing Mr. Segreti's case, his own witnesses and his own discounted testimony

during a trial that lasted from February 27, 2006 until March 23, 2006, Judge Lopez determined

that no such oral or written agreement ever occurred whereby Mrs. Corsetti agreed to leave the

Property to Mr. Segreti.  See Memorandum Order, Page 29 finding that "Plaintiff, Mario Segreti,

and the deceased, Marguerite Corsetti, **did not have an oral or written contract to will the real**

**property located on 5113 Western Avenue, N.W., Washington, DC;**").

It is clear that the same issue of the alleged agreement between Mr. Segreti and Mrs.

Corsetti is at the heart of Mr. Segreti's present claims against Mr. Christopher, et al.  That issue

was decided adversely to Mr. Segreti in the Probate Matter and the doctrine of collateral estoppel

---

[5]        The Court in Bryson raised the question of whether the doctrine of collateral estoppel was procedural or substantive for the purposes of determining the applicable law in a diversity case, such as the present one, but did not decide the issue since the law of collateral estoppel is the same for federal courts and local D.C. law.  Id. ("Thus, federal law is substantially similar to the local laws of the District of Columbia in providing that collateral estoppel precludes relitigation of an (1) identical issue (2) that was fully and fairly litigated and (3) determined by a valid judgment on the merits (4) in which the issue was essential. While the federal standard includes consideration of equitable concerns of 'working an unfairness,' the District of Columbia standard does not explicitly include that requirement.  This Court finds, however, that in the instant case the inclusion or exclusion of that element would not affect its disposition of the case.").  For the purposes of this Motion, Defendants will assert the broader federal law on collateral estoppel.

should apply to bar Mr. Segreti from relitigating that issue through this action for legal malpractice.

**2.     Issue Actually Determined by Court of Competent Jurisdiction**

Mr. Segreti brought the action before the D.C. Superior Court and litigated and lost the issue of whether Mrs. Corsetti ever agreed to transfer the Property to him.  He cannot deny the D.C. Superior Court was one of competent jurisdiction.[6]

**3.     No Unfairness to Mr. Segreti in Barring Him From Re-litigating the Issue of Whether Mrs. Corsetti Ever Had An Agreement to Transfer the Property to Him**

There is certainly no unfairness to barring Mr. Segreti from re-litigating the issue of whether Mrs. Corsetti ever had an agreement to transfer the Property to him.  Mr. Segreti had a full and fair opportunity to litigate that issue in the Probate Matter with the trial taking place from February 27, 2006 through March 23, 2006.

Mr. Segreti called witnesses during the trial in the Probate Matter.  See Memorandum Order, ¶ 32 ("Mario put on several witnesses in support of the 'deal' between he and his grandmother.")  Mr. Segreti had the opportunity to testify himself, although the Court found his testimony less than credible.  See ¶ 46 of the Memorandum Order ("[d]ue to his strained efforts, Mario's testimony seldom was sincere...  He seemed overzealous to provide a rationale for everything to the point of giving an impression that he was trying to color the facts to suit his picture of the truth.")  Mr. Segreti even had the opportunity to obtain testimony from Mr. Christopher.  See Memorandum Order, ¶¶ 20-29 summarizing Mr. Christopher's testimony. Parklane Hosiery Co., Inc., 439 U.S. at 332 n. 18 (noting that applying collateral estoppel does

---

[6]     Lee v. Bradford, 2006 WL 2520614, *2 (D.D.C. 2006) (finding the D.C. Superior Court was a court of competent jurisdiction for the purposes of applying res judicata).

not work an unfairness on party who had the opportunity to present evidence and call witnesses during trial).

Nor could Mr. Segreti assert that he lacked any incentive to litigate his alleged agreement with Mrs. Corsetti in the Probate Matter.  See Yamaha Corp. of America v. U.S., 961 F.2d 245, 254 (D.C. Cir. 1992) ("An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude.").  It is clear that Mr. Segreti had every incentive to litigate the matter fully, and clearly did so, in the underlying Probate Matter.

Accordingly, all three prongs of the test for applying collateral estoppel are met in the instant case and Mr. Segreti should be barred from re-litigating the issue here.

**B.     Application of Collateral Estoppel to Bar Mr. Segreti's Claims for the Legal Malpractice**

Given the bar to re-litigating the issue of whether Mrs. Corsetti ever agreed to transfer the Property to him, Mr. Segreti cannot meet the elements of proving a claim against the Defendants. Count I of the Amended Complaint is predicated on an alleged attorney-client relationship between Mr. Segreti and Mr. Christopher, Mr. Herge and their firm.  Amended Complaint, ¶ 44. In order to assert a claim for legal malpractice, a party must prove:  (1) that there is an attorney-client relationship; (2) that the attorney neglected a reasonable duty; and (3) that the attorney's negligence resulted in and was the proximate cause of loss to the client.  Edelberg v. Roberts, 2005 WL 1006000, *2 (D.D.C. 2005), citing Chase v. Gilbert, 499 A.2d 1203, 1211 (D.C. 1985).

Because Mr. Segreti is collaterally estopped from asserting that Mrs. Corsetti ever agreed to transfer the Property to him, he cannot satisfy the second and third elements of a claim for legal malpractice.  First, Mr. Segreti casts the duty in terms of Mr. Christopher's failure to properly advise him and Mrs. Corsetti on the transfer of the Property.  See Amended Complaint,

14

¶ 16 ("In the early 1990's, Plaintiff and Mrs. Corsetti jointly sought the legal assistance from Defendant Christopher to effectuate an inter vivos transfer of title of the Property from Mrs. Corsetti to the Plaintiff either by gift or at a discounted price."); ¶ 18 ("Both Plaintiff and Mrs. Corsetti were clients of Defendant Christopher related to the transfer of title of the property to Plaintiff."); ¶ 21 ("Relying upon advice of Defendant Christopher, Plaintiff and Mrs. Corsetti decided to effectuate the transfer of title to the Property through Mrs. Corsetti's estate upon her death."); ¶ 22 ("At no time did Defendant Christopher advise Plaintiff that, unlike an immediate transfer of title to the Property, transferring title of the Property to Plaintiff through testamentary devise would not be binding on Mrs. Corsetti without a written contract to make a will.").[7]

Yet a Court of competent jurisdiction has already determined that there was never any agreement between Mr. Segreti and Mrs. Corsetti to transfer the Property. Mr. Segreti is quite simply collaterally estopped from asserting otherwise. Without the ability to make that allegation, Mr. Segreti cannot claim Mr. Christopher breached a duty to effectuate an agreement which the parties to the alleged agreement never agreed to make in the first place.

Moreover, Mr. Segreti could not show a causal link between any alleged duty and any alleged damages because he is collaterally estopped from asserting that Mrs. Corsetti had agreed to transfer the Property to him. While not entirely clear from the Amended Complaint, the gravamen of Mr. Segreti's claim appears to be that he did not take title to the Property upon Mrs. Corsetti's death. Since Mr. Segreti cannot show that Mrs. Corsetti ever agreed *ab initio* to

---

[7]    Mr. Segreti also claims that Mr. Christopher acted in conflict of interest by drafting Mrs. Corsetti's Will and Trust which excluded Mr. Segreti. Such a claim is not recognized as Mr. Christopher has no duty to Mr. Segreti to oppose Mrs. Corsetti's estate planning wishes. <u>Chase v. Bowen</u>, 771 So.2d 1181, 1182 -1183 (Fla. App. 5 Dist. 2000) ("It is our view that a lawyer who prepares a will owes no duty to any previous beneficiary, even a beneficiary he may be representing in another matter, to oppose the testator or testatrix in changing his or her will and, therefore, that assisting in that change is not a conflict of interest.")

transfer the Property to him there is simply no causal link between the alleged breach of duty and the damages Mr. Segreti claims he suffered.  See Macktal v. Garde, 111 F.Supp.2d 18, 21-22 (D.D.C. 2000) ("The clear rule of *Niosi* and its progeny is that in order to maintain a legal malpractice action in the District of Columbia, plaintiff must demonstrate not only that the alleged malpractice was the proximate cause of the injury suffered, but also that the action for which the plaintiff had sought the attorney's services was a good cause of action."  Citing Niosi v. Aiello, 69 A.2d 57 (D.C. 1949)); McCord v. Bailey, 204 U.S. App. D.C. 334, 339, 636 F.2d 606, 611 (1980) (attorney not liable for malpractice if his client suffered no damages); Smith v. Haden, 872 F.Supp. 1040, 1044 (D.D.C. 1994) (to prove proximate cause plaintiff must show she had a good cause of action against the party she wished to sue, otherwise plaintiff "loses nothing by the conduct of [her] attorney even though the latter was guilty of gross negligence").

        In Macktal this Court found the plaintiff could not show proximate cause related to an attorney's alleged malpractice.  The plaintiff alleged that the attorney was negligent in handling a lawsuit.  The Court, however, found that the plaintiff could not state a claim because the Court of Appeals for the Fifth Circuit had already decided in another case that the plaintiff never had a good cause of action in the underlying matter.  Id. 21-22.

        While Macktal involved negligence related to an underlying case, the same proximate cause rationale applies in transactional matters such as the instant case.  See R. Mallen and J. Smith, Legal Malpractice, § 23.5 at 469 (2006 Ed.) ("Proof of causation requires analysis of the consequences of proper advice.  Thus, the client needs to prove what should have been achieved had the 'proper' advice been given. **If the alleged error is the failure to obtain or advise of a provision, concession or benefit, the client must prove that the other party would have agreed.** It is not sufficient to show that the other party 'might have' agreed.") (emphasis added);

Restatement (Third) of the Law Governing Lawyers (2000), §53(e) ("Generally applicable principles of causation and damages apply in malpractice actions arising out of a nonlitigated matter."); Hazel & Thomas, P.C. v. Yavari, 251 Va. 162, 164, 465 S.E.2d 812, 813 (1996) (plaintiff in legal malpractice case could not show proximate cause for alleged failure to include term in lease since no proof that other party to the lease would have agreed to the term).

In this case, Mr. Segreti cannot show that Mrs. Corsetti ever agreed to transfer the Property to him because the D.C. Superior Court has already determined that Mrs. Corsetti never agreed to such a transfer. Mr. Segreti's inability to show this key element is fatal to his case against Mr. Christopher, et al.

Count II of Mr. Segreti's Amended Complaint asserts a theory that he is a third-party beneficiary to the attorney-client relationship between Mrs. Corsetti and Mr. Christopher to transfer the Property to him. See Amended Complaint, ¶ 52 ("Plaintiff was a third party beneficiary of the legal representation of Mrs. Corsetti by Defendant Christopher..."); ¶ 53 ("The attorney-client relationship between Mrs. Corsetti and Defendant Christopher... related to the transfer of title of the Property to the Plaintiff and was solely for the benefit of the Plaintiff.").

While the District of Columbia courts have recognized a limited exception to the privity requirement in the context of an intended beneficiary of a will, see Needham v. Hamilton, 459 A.2d 1060, 1062 -1063 (D.C. 1983), there is no indication that the Courts have recognized a broader exception to the privity rule. Yet even if the Court were to find a broader extension, e.g. in a unilateral transfer of real property, Mr. Segreti simply cannot support a claim because a key element of such a cause of action has already been decided adversely to him in the Probate Matter.

In <u>Needham</u> the D.C. Court of Appeals recognized a cause of action by a **direct** and **intended** beneficiary of a testator's will for an attorney's malpractice in drafting the will.  A necessary requirement of the third-party beneficiary is to demonstrate that the testator intended for them to take under the will, but that the attorney's error frustrated that intent.  <u>Id.</u> at 1063 ("As already discussed, the right of action is only available to the direct and intended beneficiaries of the will and not to an "indeterminate class.").  Mr. Segreti's claim that he was a third-party beneficiary to the legal services Mr. Christopher provided to Mrs. Corsetti must be predicated on Mrs. Corsetti directly intending to benefit Mr. Segreti through the legal services rendered and, given the ambulatory nature of estate planning documents, that such services were intended to be binding on Mrs. Corsetti.  <u>See</u> <u>In re Calomoris</u>, 894 A.2d 408, 410 (D.C. 2006) (a will is not a contract); Am. Jur. Wills, § 469 ("Revocability is an essential characteristic of a will.")  Mr. Segreti, however, can simply not show that Mrs. Corsetti ever agreed to be bound by ambulatory estate planning documents executed prior to her 2004 Will and Trust.

Assuming that the Courts in the District of Columbia would extend the reasoning in <u>Needham</u> to the present situation, Mr. Segreti simply cannot make out a cause of action because he can show no intent by Mrs. Corsetti to transfer the Property to him because a court of competent jurisdiction has already determined that no such agreement ever occurred.  The doctrine of collateral estoppel bars Mr. Segreti from re-litigating the very same issue he lost in the D.C. Superior Court Probate Matter.

C.    **Mr. Segreti Has Not Stated a Cause of Action Against the Firm of Vaughan, Fincher & Sotelo, P.C.**

Mr. Segreti has named the law firm of Vaughan, Fincher & Sotelo, P.C. as a defendant in this matter.  The only allegation related to Vaughan, Fincher & Sotelo, P.C. is the bare allegation that "Defendant Christopher was a partner at Defendant Vaughan, Fincher & Sotelo, P.C. while

he was retained by the Trustees as an expert witness in litigation adverse to the Plaintiff." Amended Complaint, ¶ 45. Such a bare allegation, without more, provides no basis for asserting a claim against Vaughan, Fincher & Sotelo, P.C. without claiming that Mr. Christopher was acting within the scope of his employment for Vaughan, Fincher & Sotelo, P.C. See Wadley v. Aspillaga, 163 F.Supp.2d 1, 6 (D.D.C. 2001) ("In order to succeed under the respondeat superior theory of liability, [plaintiff] must show that a master-servant relationship existed between [Aspillaga] and [Intelsat], and that the incident at issue occurred while [Aspillaga] was acting within the scope of his employment." Citing Moorehead v. District of Columbia, 747 A.2d 138, 142 (D.C.2000) (citing Giles v. Shell Oil Corp., 487 A.2d 610, 611 (D.C.1985)). Accordingly, the claim against Vaughan, Fincher & Sotelo, P.C should be dismissed.

WHEREFORE, for the foregoing reasons, and those which may be urged upon the hearing of this matter, Defendants A. Mark Christopher, Herge, Sparks & Christopher, LLP, Vaughan, Fincher & Sotelo, P.C., and J. Curtis Herge, respectfully request this Honorable Court to dismiss the Amended Complaint with prejudice and for such other relief as this Court deems just.

Dated: April 30, 2007                    Respectfully submitted,

                                         SANDS ANDERSON MARKS & MILLER
                                         A Professional Corporation


                                         /s/ George O. Peterson
                                         _____
                                         J. Jonathan Schraub    (DC Bar No. 950816)
                                         George O. Peterson    (DC Bar No. 478050)

                                         1497 Chain Bridge Road
                                         Suite 202
                                         McLean, Virginia  22101
                                         (703) 893-3600
                                         (703) 893-8484 (facsimile)
                                         *Counsel for Defendants*

☑002

FILED
DOCKETED
OCT 17 2006

Register Of Wills
Clerk of the Probate Division

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
PROBATE DIVISION

MARIO J. SEGRETI       )
                        )
PLAINTIFF,        )     Estate of Marguerite Corsetti,
                        )     Marguerite Corsetti Trust.
v.              )
                        )
LUKE DE IULIIS, et al.   )     Adm. No. 652-04
                        )     Judge López
DEFENDANTS.     )
                        )

## MEMORANDUM ORDER

The trial of this will contest was held between February 27, 2006 and March 23, 2006, with closing argument on April 6, 2006. Three issues were before the Court: (1) whether Mrs. Marguerite L. Corsetti lacked testamentary capacity to execute the will and the trust on March 2, 2004; (2) whether she was unduly influenced by Luke De Iuliis, Marie A. Arient and Antoinette Witt to execute those instruments and to change the co-ownership of her Bank of America account; and (3) whether she had an oral/written contract with Mario J. Segreti to make a will leaving him her house. After careful review of the record in this case, the evidence presented, the testimony and demeanor of the witnesses, the Court concludes that Mrs. Corsetti had the mental capacity to execute the 2004 Will and Trust, she was not unduly influenced by anyone and she did not have a contract with Mario J. Segreti to make a will leaving him her house.

## FINDINGS OF FACTS

1.     Mrs. Marguerite L. Corsetti ("Mrs. Corsetti"), a resident and a domiciliary of the District of Columbia, died on March 24, 2004. She was born on February 23, 1922 and was 82 years old at the time of her death. Her estate was opened for unsupervised administration; her brother, Luke De Iuliis ("Luke"), was appointed the personal representative on April 7, 2005.

A 652-04 Corsetti.Findings.WillContest

Ex. 1

10/19/2006 16:25 FAX                                                        ☑003

2.      The parties stipulated that on the date of Mrs. Corsetti's death, the value of the

house was $635,000.00, and the value of her entire estate, including the house, was

approximately $1 million.  The parties also stipulated that the records of the various doctors who

treated her and the lawyers who represented her are authentic and were kept in the regular course

of businesses.  The records from Sibley Hospital, Drs. Pasquale Santini and Kenneth Goldstein,

and Washington Home Hospice were all admitted into evidence.

3.      Mrs. Corsetti was a widow who, during her lifetime, had given birth to four

children: (1) The eldest, Anita Segreti ("Anita"), who has two children, Mario J. Segreti

("Mario") and Rose Marie Beckner; (2) Harry Joseph Corsetti, who died in 1984 of cancer linked

to Agent Orange and survived by two sons, Justin Corsetti and Damien Corsetti; (3) Marie

Antoinette Arient ("Marie"), and (4) Antoinette Witt ("Antoinette"), who has two sons, John

Stedman Witt and Christian Witt.  Mrs. Corsetti had a high school degree and worked as a

cashier at a grocery store.

4.      In 1990, when Mario was 25 years old and had just graduated from college in

Florida, he moved in with his grandmother, Mrs. Corsetti, at her home on 5113 Western Avenue,

N.W., Washington, DC ("the house").  Mario had two degrees, one from the Culinary Institute of

America and one in Business Administration.  The stay with his grandmother was to be

temporary.  Now 41 years old, Mario continues to reside in the house pursuant to a temporary

restraining order, a preliminary injunction and protective orders entered in Civil Action No.

4255-04, which has been stayed pending the resolution of this case.

5.      Mrs. Corsetti made a number of wills in her life.  Three have been filed with the

Court: (1) a will executed on July 1, 1993; (2) a will executed on August 19, 1997 ("1997 Will");

and (3) a will executed on March 2, 2004 ("2004 Will").  All of them are in proper form and

have the proper attestation. On August 19, 1997, Mrs. Corsetti also executed the Marguerite L.

Corsetti Trust ("Trust"). It was a revocable living trust, which she amended and restated on

March 2, 2004. She named Luke the executor of her will, and named both Luke and her former

son-in-law, Paul Arient, co-trustees of the Trust. She further granted Luke durable powers of

attorney on both occasions.

      6.      Under the will of 1993, Mrs. Corsetti devised her property, including her house,

among her children, *per stirpes.*

      7.      Under the 1997 Will, executed in the law office of John F. Wolf, Jr., Mrs. Corsetti

devised the house and its contents to Mario. She gave her other grandsons, Justin and Damian

Corsetti, $5,000.00 each, her daughters, Anita Segreti and Marie Arient, $100.00 each, and split

the residue among her other daughter Antoinette Witt and her grandchildren Mario and Rose

Marie Beckner.

      8.      Under the 2004 Will executed on March 2, 2004, Mrs. Corsetti made provisions

to pour her estate, other than some tangible personal property, into the Trust. The house was

conveyed to the Trust on March 12, 2004. And as amended and restated on March 2, 2004, the

Trust is to distribute the trust assets, including the house, after Mrs. Corsetti's death, among such

issues *per stirpes.* In addition, on February 26, 2004, Ms. Corsetti removed Mario as a joint co-

owner on her Bank of America account and replaced him with Luke and Marie Arient.

Previously, she had Luke, then Anita and Mario Segreti, before changing to just Mario as a co-

owner on the account.

      9.      The changes to the trust, the will and the bank account all occurred soon after

Mrs. Corsetti returned home on February 23, 2004 after a one-week stay at Sibley Hospital,

during which time she was diagnosed with pancreatic cancer that had spread to her liver.

10.    Mrs. Corsetti's oncologist, Dr. Kenneth Goldstein, wrote in the hospital record on February 20, 2004, "[patient] has decided to try chemotherapy." Her internist, Dr. Pasquale Santini, testified at the trial that patients with pancreatic cancer generally suffered from depression more than other cancer patients, that the effect of chemotherapy typically hit a patient in 10 to 14 days after it was administered. He opined that the pain and opiate medications Mrs. Corsetti was taking, in combination with diabetes, hearing loss, hormonal changes, cardiac failure and other ailments would greatly impact her and cause reduced mental and physical capacity. But his notes of February 24, 2004 indicated Mrs. Corsetti's mental status as "Alert and oriented X3." On February 26, 2004, both doctors saw Mrs. Corsetti and agreed to her decision to not have any more chemotherapy. That was the last time Dr. Santini saw Mrs. Corsetti, she had since been referred to the care of the Washington Home Hospice.

11.    The Hospice chart on February 24, 2004 remarked that Mrs. Corsetti was in full state of consciousness while being physically weak and requiring considerable assistance with self-care. Though she had hearing difficulties and her physical condition was declining, the Hospice charts of February 27, March 2, 5, 8, 10 and 12, 2004 all showed Mrs. Corsetti as "Alert, Oriented to person, Oriented to place, Oriented to time." The chart on March 8th had a particular entry reflecting that Mrs. Corsetti's only worry at the time was that "my daughters don't get along with each other." The chart also remarked that "[Mrs. Corsetti] was sorting jewelry to be left to various family members … appears more open to discussing these issues with family and clearly has insight into her prognosis." On March 15th, the chart changed her mental status to "other" and included a note about her daughter Marie describing her as "catatonic." But by the next day, March 16th, the chart again noted Mrs. Corsetti as in an alert state. Finally on March 22, Mrs. Corsetti was observed as having anxiety, hallucinations and a

4

10/19/2006 16:26 FAX                                                                  ✉006

"Nearing death awareness."

12.     Mario testified that after her return from the hospital on February 23, 2004, Mrs.
Corsetti's physical condition deteriorated.  She was easily fatigued, though he would not go so
far to say that she could not think or that she did not have mental capacity.  Marie and Antoinette
flew into Washington, D.C. from California, on or about February 19, 2004, to stay and care for
their mother.  Mrs. Corsetti needed assistance with almost all activities of daily living.  Marie
testified that Mrs. Corsetti expressed the wish to have Antoinette attend to her daily care, and
Marie was to be the paper person, the secretary.  Antoinette was the main caretaker with
responsibility for Mrs. Corsetti's medications, up to 22 or so pills at times, which the Hospice
coordinated.

13.     Mario and his mother, Anita, both testified that Marie and Antoinette began to
regulate what people and when they were allowed to visit Mrs. Corsetti.  Mrs. Corsetti was very
popular, and many came by to visit.  Although relatives and a few others were able to visit, many
of Mrs. Corsetti's friends, such as John Swiatocha and Drake Russell, among others, all testified
that they were unable to see her.  LaVaugh Queen, a long time friend of Mrs. Corsetti, said that
she was able to visit.  Steve Jennings, a neighbor of Mrs. Corsetti, said he had no problem getting
into the house initially but later saw a sign for no visitors.  William and Sharon Gormley, friends
of Mrs. Corsetti and her family, indicated that they were able to visit a couple times during the
first two weeks after Mrs. Corsetti's return, but were unable to visit thereafter.  Anita said that
her sisters had a no-visitor sign up about two weeks after Mrs. Corsetti's return from the hospital.
Antoinette's testimony was that the sign was up on or about March 12 or 13th of 2004 at their
mother's request.

14.     Anita described the situation as follows: "My sisters came into my mother's house

5

and took over like Hitler took over Europe. No one could go in, no one could talk to my mother." After her sisters moved into the house, Anita said, she was not allowed to have a conversation alone with her mother. Antoinette said that Anita was upsetting their mother a lot, so she did in fact watch her and would not leave her alone with their mother. Anita said, the only occasion she had with her mother alone was when her sisters thought their mother was asleep. According to Anita, when her mother woke up, she told Anita that she knew that Anita did not want to be in the will, but she was giving the house to Anita so that Anita could give it to Mario. Mario also testified that on or about March 4, 2004 as he was on his way to work, Mrs Corsetti beckoned and whispered to him that "they would not let her talk to him," so she talked to Mark Christopher. Mario believed that "they" meant his aunts, who told his grandmother that he was going into bankruptcy, and because he supposedly was in such financial trouble she had to sign a will putting his mother's name for him in order to protect him.

15.    Neither Marie nor Antoinette testified to talking to Mrs. Corsetti about Mario's financial trouble. Whereas LaVaughn Queen testified that in January of 2004, she saw a health notice stating that the Health Department closed Heller's Bakery, of which Mario was a co-owner. According to Ms. Queen, there was some talk about bankruptcy, and Mrs. Corsetti was very afraid that the bankruptcy would affect her and her estate.

16.    Ms. Queen also testified that Mrs. Corsetti had begun thinking of changing her will in 2000; she was particularly concerned that Marie did not have a house and she would like all her children to have a house. She said that Mrs. Corsetti had trusted Mario around 1996 or 1997; at the time, Mrs. Corsetti had been fearful of the nasty divorce Marie was going through with her second husband, so she decided to give Marie's share of her estate to Mario, who agreed that he would then split it with Marie. Anthony De Iuliis ("Tony"), Mrs. Corsetti's youngest

6

brother, confirmed that in the last five years of her life, his sister expressed her wish to give the house to Mario and Marie.

17.    Ms. Queen was formerly a court reporter and now works for an intellectual property law firm. She met Mrs. Corsetti in 1994 when she rented a room in Anita's house. She and Mrs. Corsetti became very good friends over the years. She often drove Mrs. Corsetti to the cemetery to visit Mrs. Corsetti's husband and son, and she frequently took Mrs. Corsetti shopping. They talked at least three or four times a week, and in their conversations Mrs. Corsetti would tell her about many of her family matters. Ms. Queen came across as a very credible witness, with a remarkable memory for details that were often expressed with specific reference to other events and significant occurrences.

18.    In October or November of 2003, as Mrs. Corsetti was recuperating from heart surgery, she again told Luke, his wife Teresa and Antoinette that she wanted to make changes to her will, but she was not specific about what the changes would be. Antoinette testified that later, in December of 2003, her mother had wanted to remove Mario from her will because she no longer trusted him.

19.    When attorney Christopher visited Mrs. Corsetti at Sibley Hospital in February of 2004, he said that they did not discuss changing her will. And as related by Antoinette, a day after returning home from the hospital Mrs. Corsetti asked her to get her last will from the safe in the house. Unable to open the safe, Marie testified that Mrs. Corsetti asked her to call Mr. Christopher for a copy, and that the staff from Mr. Christopher's office faxed one to the house. On that same day, Marie said that her mother also offered to leave the house to her, but she was uncomfortable accepting because her mother had three children. A day or two after that, accordingly to Marie, Mrs. Corsetti again asked her to call Mr. Christopher to relay the changes

to her will, but his office said that he had to speak to Mrs. Corsetti personally before making any modification.

20.     A. Mark Christopher is an attorney who has practiced in estate planning for more than 27 years, with special expertise in the area of Alzheimer's and dementia. He had been Mrs. Corsetti's attorney for more than nineteen years. He helped her with the 1997 and 2004 Wills and the trust instruments. He testified that on or about February 27, 2004 when he met with Mrs. Corsetti at her home, "she was a bit robust ... she was in character and she was fine." He noted that Mrs. Corsetti had a precise and accurate knowledge of her assets when he commenced the meeting with her, that she knew who the people in her family were, and that she could articulate coherently the various feelings that she had about each person and whether or not she wanted to leave that person anything.

21.     Luke and Teresa were with Mrs. Corsetti during her meeting with Mr. Christopher, they both thought Mrs. Corsetti was competent.   While the meeting was taking place, Mr. Christopher said that Marie and Antoinette were out and about in other parts of the house.  The sisters said that they went about doing their chores around the house, hanging laundry in the backyard and having a cigarette on the steps, and that aunt Teresa came out later to get them to join the meeting, at which point Mrs. Corsetti informed them of the changes in her testamentary scheme.

22.     Mr. Christopher testified that he and Mrs. Corsetti did most of the talking in the meeting while the De Iuliises remained mostly silent. They discussed how Mrs. Corsetti would leave the property – she was upset with Anita and did not want to give her anything; she was concerned about Marie's financial stability after her second divorce; she was proud of Antoinette; and she felt no need to give to the children of her deceased son because she already

8

paid much of their father's medical bills.  Mr. Christopher suggested leaving the house to Marie and Mario, Mrs. Corsetti said that they did not get along.  Mr. Christopher suggested leaving some money for Mario, she said no because Mario had lived at the house for free for 14 years.  Mr. Christopher then suggested leaving the house to the three daughters equally, and she liked the idea.  They also discussed how Mario would eventually get his mother's share and use that to buy a house.

23.    According to Ms. Queen, Mrs. Corsetti was very upset with Anita over an incident in October of 2002 while she was in California visiting Marie and Antoinette.  In her testimony, Anita had said that Mario was a very neat and orderly person, but her mother lived with clutters.  By her own admission, Anita said that she took the opportunity while her mother was away to clean out 162 boxes of old newspapers and magazines, a broken TV set and two chairs.  She said that Mario, Luke and Teresa, Tony and his wife Connie were present for part of her cleaning-out, but they did not participate in it.  Ms. Queen described Mrs. Corsetti as being "astounded" by what Anita and Mario had done to her home, by the many sentimental items that were gone -- at least sixty boxes of out-of-print periodicals from before her marriage and before Pearl Harbor, the original Saturday evening posts and lady home journals, which Mrs. Corsetti had found out to be valuable and was not ready to part with or sell.  She said that Mrs. Corsetti also felt that it was an insult to injury that Anita used her money to dump her things.  Ms. Queen said that Mrs. Corsetti was devastated about what Anita had done, and she feared that Anita would again remove her things without her knowledge and consent.  According to Ms. Queen, she and Mrs. Corsetti did in fact catch Anita doing just that on the second Saturday of December 2003.

24.    After the meeting with Mr. Christopher on February 27, 2004, Marie said that

9

they made an appointment with him to execute the documents on the following Tuesday, March 2nd. Since Mr. Christopher's office did not handle deeds in the District, Mrs. Corsetti also asked Marie to contact attorney Ray Kaufman to ensure that the transaction conveying the house to the Trust would take place; it occurred on March 12, 2004.

25.     On March 2, 2004, Mrs. Corsetti, Antoinette, Luke and Teresa drove to a nearby Bank of America to execute and notarize the 2004 Will and Trust. Mr. Christopher met them at the bank. Soon after they traveled to another bank nearby, the National Capital Bank of Washington, in order to find a notary licensed in the District of Columbia. There, Mrs. Corsetti sat next to Rachel Delahant, the branch manager who later witnessed the signing. In her testimony, Ms. Delahant recalled Mrs. Corsetti's visit specifically; she confirmed Mrs. Corsetti's competency and recalled Mr. Christopher showing and reading some documents to Mrs. Corsetti. Kirk Birdsong was the notary who notarized Mrs. Corsetti's 2004 Will on March 2, 2004. He did not remember Mrs. Corsetti specifically, but he testified to having a regular practice of making a "mini-competency assessment" of any person before him for notarization. He recognized his own signature on the 2004 Will and Trust, and testified that he would not have notarized the documents if Mrs. Corsetti had not passed his assessment test.

26.     Mr. Christopher testified that he did not read the will or the trust document to Mrs. Corsetti, but he went over them with her. He said he spent approximately one half of an hour in the bank discussing the papers with her prior to the signing. He was of the opinion that Mrs. Corsetti was competent. However, J. Gordon Forrester, Plaintiff's expert on the field of probate planning in the District of Columbia, testified that before Mr. Christopher could properly assess Mrs. Corsetti's competence to dispose of her property, he should have obtained a copy of her medical records or talked with her doctor. Whereas Nicholas Ward, Defendants' expert,

testified that an attorney who reasonably assesses that his client is competent does not violate

any standard of care in the District of Columbia by not consulting with a client's physician or

obtaining medical records prior to engaging in estate planning. The evidence of Mrs. Corsetti's

competency was overwhelming, such that the experts' differences on the proper standard for an

attorney to assess his client's mental capacity is not as critical and controversial as the parties

would like to emphasize.

27.    After Mrs. Corsetti's passing, in a March 31, 2004 letter admitted into evidence,

Mario said to his uncle Luke, "It is a known fact that all of my grandmother's property including

the house at 5113 Western Ave., N.W., is now owned by the 'Marguerite L. Corsetti Trust.' It

does not belong to her heirs, and therefore the trustees have full discretion as to who resides there

and to the disbursements of any and all property." Mario's explanation that the letter was part of

a settlement effort to enforce a "deal" he had with his grandmother was just not credible.

28.    Mario testified to having filed an affidavit stating that in 1992 he entered into a

"verbal agreement" with Mrs. Corsetti. He said that in 1992, he and his grandmother had a series

of conversations about his grandmother not wanting to be alone, and about the fact that that there

was no one to maintain her house. He told his grandmother that if he were going to put in so

much work into a house, he would rather that the efforts went into his own house. So they talked

about his purchasing Mrs. Corsetti's house for $200,000 over ten years, and that he would put

work into the house. The purchase did not take place because they learned from attorney

Christopher that they would have a lower tax liability if Mario were to get the house by bequest

and take the property at a step-up basis. When asked about a meeting discussing Mrs. Corsetti's

1993 will that bequeathed her house to others, Mario said that he deliberately left that meeting

because he did not want to be a part of it; as Mario explained, that was because in 1993 he and

11

his grandmother were still discussing the details of their agreement.

29.     Then in 1997, Mario said that he told his grandmother that he was moving on because he had not seen anything in writing about what they talked about in 1993. Mario testified that Mrs. Corsetti was upset about his intent to leave. Consequently, Mario said, Mrs. Corsetti consulted Mr. Wolf, then Mr. Christopher, and executed the 1997 Will wherein the house was now devised to him in return for the promises he "already made", which, according to him, was to continue doing what he was doing for her, for the house, and for the promise of not letting anyone take her out of the house to a nursing home.

30.     Attorney Wolf testified that during the signing of the 1997 Will in his office, Mrs. Corsetti remarked that Marie was not good with money and that she was devising the house to Mario because he earned it for taking care of her. Mr. Wolf had known Mario since the mid-1990s, and it was Mario who introduced him to Mrs. Corsetti around 1996 or 1997 regarding the sale of her farm in Mitchellville, Maryland. Mr. Wolf testified that he did some negotiating in the farm sale, but it was Mario who handled most aspects of that deal, with the purchase price structured in a deferred back note.

31.     After Mrs. Corsetti executed the 1997 Will, Mario testified that he, among others, installed a sidewalk, built a stone retaining wall, new front steps, front entryway and close-in porch, and he installed new windows and a garage door. He said that he also commenced a major project for a new master bedroom with a walk-in closet, and he continued to assist his grandmother with errands, shopping, spring and fall house cleaning and household maintenance.

32.     Mario put on several witnesses in support of the "deal" between he and his grandmother.

33.     Drake Russell, a contract specialist, knew Mario for twenty-five to thirty years,

12

since they were around 8 or 10 years of age. He said he participated in much of the projects Mario was working on around the house and was compensated with meals. He said that Mario had shown him the 1997 Will, and that he and Mario talked about the arrangement in details. He also testified that Mrs. Corsetti said that she and Mario had a deal, that he would provide companionship and fix things around the house, and he would get the house.

34.    Daniel Barbieri, a patent lawyer, knew Mario since 9th grade in 1979. He said that whenever he visited Mario at the house, Mario would show him the work he had done for Mrs. Corsetti. According to him, Mario said he and his grandmother worked out a deal, that he was to do the work and that as long as he took care of her, the house would be his. He further stated that Mario had said, around 1996 or 1997, that he was covering the material costs because in the end the house would be his.

35.    John Swiatocha also knew Mario since 1979; he was Mario's geometry teacher, his softball coach and guidance counselor. He testified that he painted Mrs. Corsetti's house on several occasions and was paid for his work. He said that he and Mrs. Corsetti would talk about what upgrade she wanted for the house and she had said Mario would attend to them.

36.    Harry Kazanjin knew Mario for at least 12 to 15 years. He testified that Mrs. Corsetti spoke about Mario being her companion, about his doing everything she needed done, and about how happy she was when the kitchen was finally finished. He also testified to Mrs. Corsetti complaining about all the projects taking too long. He said that Mario told him that eventually Mrs. Corsetti would leave the house to him, and in turn he told Mario to protect himself, to have that understanding in writing. Then, according to Mr. Kazanjin, Mrs. Corsetti had blurted out one day that she left the house to Mario, that she wanted it to go to him.

37.    John Deer was a friend of Mrs. Corsetti's son, Harry. Since 1990, according to

Mr. Deer, he would talk to Mrs. Corsetti about the house, about the upgrade she wanted done.

He said that annually for a period of ten years he would take a week plus some weekends to

work on Mrs. Corsetti's house. And from 1997 until Mrs. Corsetti's death, he worked with

Mario on many projects for the house. He was compensated with "some very good dinners."

Regarding her will, he said that Mrs. Corsetti indicated that she wanted Mario to have the house

and its content, and $5,000 each to Harry's two sons when they get older. He also said that Mrs.

Corsetti would give only $100 each to Marie and Anita because she had helped Marie all along

and because Anita wanted everything to go to her children. As for Antoinette, Mrs. Corsetti

expressed that she would leave a nice chunk of cash without specifying an amount.

     38.    Mr. William Gormley met Mrs. Corsetti when she was working at a gas station in

the mid-sixties. He said he would refer to Mrs. Corsetti as "mom" and she in turn would

introduce him as her "son". He testified that it was not Mrs. Corsetti's nature to complain about

her family. When Mrs. Corsetti was at the hospital due to her heart ailment in October or

November 2003, she told him that she wanted Mario to have the house because he had stayed

with her all these years and she felt that it would be the right thing to do. He described Mrs.

Corsetti and Mario's arrangement as a mutual understanding, that he lived with her, that he

helped her out and she helped him out.

     39.    Mr. Gormley ended his direct testimony with a statement that Mario had a talent

for repairing houses, that Mrs. Corsetti accepted Mario's performance, and according to him, that

was like an "oral contract." This sounded awfully like a witness trying to dress the evidence to

fit a legal standard. The Court does not give it any weight.

     40.    Mr. Steve Jennings moved into Mrs. Corsetti's neighborhood around 1996 or

1997. He testified to knowing Mrs. Corsetti quite well; he described her as a pistol, the queen of

the backyard alley that they shared as neighbors. He testified to seeing Mario working on the house, and described Mario as someone who would overbuild everything to the "nth degree" so that things would last. He talked about Mario's woodwork shop in the basement as a handyman's dream. And he said that Mrs. Corsetti had a habit of telling him about what Mario did, bragging about Mario's work as a badge of affection.

41.    But according to Antoinette and Marie, not unlike Mr. Kazanjin's testimony, Mrs. Corsetti complained about Mario taking too long in the repairs and remodeling of the house, in particularly her bedroom. Patricia Walker, Mrs. Corsetti's niece, testified that Mrs. Corsetti was very discouraged about the constructions in the house, about the unfinished projects, and about the many years that she was displaced from her bedroom. Luke also confirmed that his sister had complained to him about the five years it took to finish her bedroom.

42.    In addition, Tony and Marie testified that Mrs. Corsetti had told them that she paid for the repair and upgrade of the house, and that it was very costly. To Antoinette, Mrs. Corsetti said that she had spent a lot of money, and that she would have done better with a contractor, and things would have been done faster. And to Marie, she complained that she was not a priority in his life, or else he would have finished the projects quickly.

43.    Mario's friend, Mr. Barbieri, had testified that Mario could no longer work as a chef or a cabinetmaker after a neck injury from a 1995 car accident. And according to Ms. Queen, after that accident and before he became a stockbroker in 2000, Mario did not have a regular job. Ms. Queen went on to testify that Mario never paid rent, food or utilities, including a DSL Internet connection for which Mrs. Corsetti had no use. Mrs. Corsetti would put money out in a dish in the dining room; whenever Mario was out of work or needed money, he would take some from the dish or she would give him money, over $100 a week. Ms. Queen further

15

10/18/2006 16:28 FAX                                                    017

said that when Mario received a settlement from the car accident, he used that money to purchase

a part ownership in Heller's Bakery.

44.    On the other hand, Mr. Barbieri also testified that around 1996 and 1997, Mario

gave him the impression that Mario was covering the material costs for the constructions on the

house. Mario offered into evidence some payments that he allegedly made for the materials to

upgrade or remodel the house, but those numbers seem to pale in comparison to the extensive

and high-quality work products that Mario spent a great deal of effort showing and explaining to

the Court during his testimony.

45.    The Court finds it more credible that Mrs. Corsetti had in fact paid for most of the

projects, which explains why Mrs. Corsetti complained to Tony, Marie and Antoinette that for

the amount of time and money Mario spent on the constructions, she could have paid a

contractor for less and things would have been done sooner. By his own testimony, corroborated

by the testimony of Ms. Queen and the others, Mario admitted to working a lot, moonlighting at

the bakery by night and working as a stockbroker by day, which explains why Mrs. Corsetti

complained to Antoinette about not seeing Mario for up to three or four days at a time, why she

complained to Marie about Mario not putting her as a priority in his life, why others like Ms.

Queen testified to frequently taking Mrs. Corsetti shopping or to the cemetery, and why Mrs.

Corsetti's bedroom and several other projects took up to six years to complete.

46.    Due to his strained efforts, Mario's testimony seldom was sincere. In his

testimony, Mario frequently went off on explanations of things that were not asked by either his

counsel or the opposing counsel. He seemed overzealous to provide a rationale for everything to

the point of giving an impression that he was trying to color the facts to suit his picture of the

truth. He said he did not know about needing a written contract to make a will, yet his history

16

was anything but that of someone who is naïve about business dealings. He had negotiated a sale contract of a farm as far back as 1997 and had dealings with attorney Wolf on other matters even before that, which all begs the question of why he did not consult an attorney if in fact he was unfamiliar with the need to get a deal in writing. While it may be that in the nature of family affairs business formalities often take a back seat; this family is far different. Mario contends that the 1997 Will represents the formality of a business transaction. In making this assertion, Mario reveals his failing. All indications are that this family is more sophisticated than others who would permit something like the 1997 Will to be a tacit contract to will a piece of property. The evidence overwhelmingly suggests that if the 1997 Will were intended to be part of an agreement, it would have been spelled out in that will.

47.     Mario's demeanor at times exhibited a certain arrogance, a certain do-as-I-want attitude, which explains why he testified to planting fig trees in the back yard in 2001 with three plaques that he got all the way from Tennessee, one of which was in memory of Mrs. Corsetti even though she was still alive and in good health. Mrs. Corsetti complained about it to Tony, and told Ms. Queen that she hated "that thing." Mario did not consult Mrs. Corsetti about the fig trees or the plaques, and according to Marie, Mrs. Corsetti was also not consulted on some other projects for the house. The Court is further convinced that the commercial type kitchen that Mario imposed and the handyman's dream workshop in the basement that he guarded possessively were more for his personal needs than of Mrs. Corsetti's choice. Whereas Mrs. Corsetti's bedroom, only at Luke's insistence, was finally finished about a month before her death.

10/19/2006 16:28 FAX ... ⌶019

## CONCLUSIONS OF LAW

*Testamentary Capacity*

48.    . A will or a codicil is not valid for any purpose unless the person making it is, at the time of executing or acknowledging it, of sound and disposing mind and capable of executing a valid deed or contract. *See* D.C. Code § 18-102 (2001, as amended); *Nelson v. Dohoney*, 58 U.S. App. D.C. 338, 30 F.2d 748 (1929) (decedent who lacks testamentary capacity could not make a valid will).

49.    The presumption is that a person is competent. *See Wood & Wood v. Marin & Vaughn*, 641 A.2d 853 (D.C. 1994). The burden of proof is on the party asserting the person in question's incompetency, to show that she does not possess "sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which she is engaged." *Butler v. Harrison*, 578 A.2d 1098, 1100 (D.C. 1990) (citations omitted).

50.    Dr. Santini gave his medical opinion of the likelihood that patients suffering from pancreatic cancer would suffer depression after chemotherapy. But his notes do not reflect Mrs. Corsetti as having suffered depression. And he had no direct knowledge of Mrs. Corsetti's competency on either February 27 or March 2, 2004, the days of the transactions at issue here. The hospice records, on the other hand, show that Mrs. Corsetti was overall lucid and oriented despite her pain. Specifically, the charts reflect Mrs. Corsetti as mentally alert on both of those dates.

51.    Furthermore, Mario himself testified that he would not go so far to say that his grandmother could not think or did not possess mental capacity after her return from the hospital on February 23, 2004.

52.    In addition, the attesting witness and notary on March 2, 2004 testified to Mrs.

18

Corsetti's competency. Attesting witnesses who were present at the moment of execution of the will were under a duty to inquire into the competency of the maker of the will, so their testimony may be of a greater value than that of other witnesses who were not present at the time of execution and who were under no such duty. *See Thompson v. Smith*, 70 App. D.C. 65, 103 F.2d 936 (1939). Moreover, the credibility of the testimony from Rachel Delahant and Kirk Birdsong, the witness and the notary to the will signing on March 2, 2004, did not wane on cross-examinations.

53.    In view of such potent evidence, Plaintiff has not established a sufficient basis for the Court to find Mrs. Corsetti lacking the requisite testamentary capacity to execute the 2004 Will and Trust.

*Undue Influence – 2004 Will and Trust*

54.    "To constitute undue influence, the pressure on the testator must destroy his agency and free will; in effect, the will of another must be substituted for his own." *Himmelfarb v. Greenspoon*, 411 A.2d 979, 984 (D.C. 1980) (citation omitted); *see Estate of Broun v. Broun*, 413 A.2d 1310, 1313 (D.C. 1980). Influence, in order to be undue within the meaning of any rule of law, must be an influence exercised either by coercion or fraud. *Barbour v. Moore*, 4 App. D.C. 535, 551 (D.C. Cir. 1894).

55.    Direct proof of undue influence is not necessary. *Hagerty v. Olmstead*, 39 App. D.C. 170, 175 (D.C. Cir. 1912). Undue influence is nearly always proved by circumstances alone. *See Wiggins v. Smith*, 87 U.S. App. D.C. 112, 183 F.2d 831, 832 (1950). But, it is not enough that there is a suspicion or possibility of undue influence. *Himmelfarb, supra*, 411 A.2d at 984.

56.    The influence of a person in a confidential relationship with the Testatrix is

19

scrutinized more closely than the influence of an ordinary person, especially where the decedent was aged, infirm and of a weak mind. *Nelson v. Doheny*, 58 App. D.C. 338, 30 F.2d 748 (1929); *Hagerty, supra*, 39 App. D.C. at 175; *Barbour, supra*, 4 App. D.C. at 535. But "[c]onfidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence." *Roberts-Douglas v. Meares*, 624 A.2d 405, 420 (D.C. 1992) (quoting *MacMillan v. Knost*, 75 U.S. App. D.C. 261, 126 F.2d 235, 236 (1942), *cert. denied*, 317 U.S. 641 (1942)).

57.     Undue influence may be by fraud. If a person lies to the testatrix, raising prejudice in her mind such as would turn her against the natural objects of her bounty, and by contrivance, keeps her from intercourse with her relatives, friends, etc. and then claims that these persons were showing no interest in her, such contrivance may be positive fraud. *Duckett v. Duckett*, 77 U.S. App. D.C. 303, 134 F.2d 527 (1943); *Barbour, supra*, 4 App. D.C. at 551.

58.     The requisite elements of fraud are (1) false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) with intent to deceive; and (5) action is taken in reliance upon the representation. *Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977), *cert. denied*, 434 U.S. 1034 (1978).

59.     Mario suggested that it was Antoinette and Marie who told his grandmother lies about his financial troubles with Heller's Bakery and as a result, his grandmother wrote him out of her will. But it was Ms. Queen who testified to being a source of that information, and who affirmed Mrs. Corsetti's fear of its impact on her estate. Consequently, Mrs. Corsetti told both Mario and his mother, Anita, that she acted to protect Mario by devising part of the property to Anita, who was likely to give it to her son, Mario. Mr. Christopher testified to knowing this plan, a similar scheme that Mrs. Corsetti seemed to have used in the past when she allegedly

gave Mario Marie's share in order to protect Marie's asset from a nasty divorce. The evidence

neither cast doubt on the truthfulness of the notice of Heller's Bakery closing, nor raise suspicion

on the likelihood that Mrs. Corsetti did or could have formed the opinion herself about the

possibility of the bakery's pending bankruptcy. Viewed in this light, Plaintiff has not met his

burden of proof with regard to any allegations of fraud.

60.     Undue influence may also be by force or coercion. Influence gained by years of

mutual affection is not sufficient at law to establish undue influence. *See Broun, supra,* 413

A.2d at 1313; *In re Estate of Weir*, 154 U.S. App. D.C. 404, 408, 475 F.2d 988, 992 (1973).

Influence gained by kindness and affection will not be regarded as "undue" if there has been no

imposition of fraud, even if such influence induces the testatrix to make a voluntary

disproportional disposition of her property in favor of those who have contributed to her comfort.

One has the right to influence another to make a will in her favor. She may state to the testatrix

why she should be a beneficiary. Her reasons for seeking to be a beneficiary may be based on

kinship or friendship, service, need, kindness or any other sentimental or material consideration.

One can use arguments and persuasion so long they are fair, honest and are not oppressive to a

degree where they become coercive. *MacMillan, supra,* 75 U.S. App. D.C. at 262, 126 F.2d at

236; *Estate of Weir, supra,* 154 U.S. App. D.C. at 408, 475 F.2d at 992.

61.     Mario and his mother, Anita, alleged that Mrs. Corsetti was isolated and

controlled in the last month before her death, and that Marie and Antoinette turned visitors away.

But Mrs. Corsetti was not so isolated so that family and close friends were unable to visit. Anita

testified that her mother became progressively worse, so to the extent that there was a sign to

discourage visitors it seemed a reasonable gesture for a dying person or her family to value her

comfort above the need for observing social niceties. Though Mario and Anita both testified to

21

having only one opportunity to be alone with Mrs. Corsetti, such testimony alone is not sufficient to give rise to an inference that Marie, Antoinette or anyone else forced or coerced Mrs. Corsetti into changing her will or devising her property in a way against her wishes.

62. Mario and his mother also alleged that because Mrs. Corsetti was so dependent on Antoinette and Marie for all activities of daily living, she was somehow unable to exercise her free will with regard to the disposition of her estate. Mr. Christopher's testimony about the discussion he had with Mrs. Corsetti on February 27, 2004 belies this inference. The evidence from which the Court might draw an inference of undue influence is particularly lacking when the Court takes into consideration witnesses' testimony that Mrs. Corsetti had expressed on several occasions, as early as in 2000, that she wanted to change her will and that she wanted her children to have some financial stability.

63. The effort to charge Luke as having exercised undue influence on his sister with regards to her disposition of her property is equally unimpressive. His mere presence in the meetings when Mrs. Corsetti discussed changes to her will and signed the documents is hardly enough to constitute fraud or coercion. To the contrary, the history points to a closeness of trust, confidence and respect between brother and sister.

64. The Court therefore finds that Plaintiff has not met his burden of showing that either the 2004 Will or Trust was the product of undue influence exerted by Marie Arient, Antoinette Witt or Luke De Iuliis.

*Undue Influence – Bank of America Account*

65. Applying the same analysis to the issue of the bank account, Plaintiff likewise has failed to demonstrate that any undue influence was exerted over Mrs. Corsetti in naming different co-owners on the account. The record is nearly barren of any evidence worthy of undue

influence by either Luke or Marie in this regard. Antoinette Witt was not added to the bank

account, so this allegation cannot be ascribed to her. Accordingly, the Court finds no undue

influence with respect to the change of Mrs. Corsetti's Bank of America account.

*Oral Contract to Make a Will*

66.      "[O]rdinarily, in the absence of a close family relationship, a promise to pay will

be implied in law when one party renders valuable services that the other party knowingly and

voluntarily accepts." *Brown v. Brown*, 524 A.2d 1184, 1186 (D.C. 1987). When there is an

applicable presumption that services were rendered gratuitously, a promise to pay obviously

cannot be implied by the mere rendering and acceptance of valuable services. *Brown, supra*, 524

A.2d at 1187. The presumption itself, as a matter of law, negates any implication that "it would

be unjust for the recipient to retain the benefit conferred" without paying for it. *Id.* It follows,

then, that when a presumption of gratuity is applicable, a claimant may only recover by rebutting

that presumption with evidence of an express contract or a contract implied in fact. *Id.*

67.      Courts have found parent-child relationship, *see Tuohy v. Trail*, 19 App. D.C. 79

(1901), and sibling relationship, *see Brown, supra*, 524 A.2d at 1187; *Green v. D.C. Department*

*of Employment Services*, 499 A.2d 870, 874 (D.C. 1985), inherently close to sustain the

presumption. Although a grandparent-grandchild relationship is perceived more remote than that

of a parent-child or sibling relationship, its nature and degree merit sustaining the presumption

and they are factors to be considered in determining whether or not the claimant has

satisfactorily rebutted the presumption. *Brown, supra*, 524 A.2d at 1187-88.

68.      The District of Columbia Court of Appeals recently stated that a will is not a

contract. *In Re Calomiris*, 894 A.2d 408, 410 (D.C. 2006). Thus, the 1997 Will is not an

express contract to rebut the presumption of gratuity. Instead, Mario needs to overcome the

presumption, by a preponderance of the evidence, that there was a contract implied in fact between him and his grandmother. *See Brown, supra*, 524 A.2d at 1189-1190 (family members are less likely to formalize contractual arrangements between themselves). The evidence offered must be sufficiently corroborated when the other party to the contract is no longer able to speak for herself. *See* D.C. Code § 14-302; *Gray v. Gray*, 412 A.2d 1208 (D.C. 1980); *Tolliver v. Durham*, 240 A.2d 359 (D.C. 1968).

69.     We need not apply the "substantially more credible" corroboration test that the District's dead man statute requires, and we need not apply the "clear and convincing" test that a claim of oral contract to make a will ordinarily requires. For the evidence in this case is not sufficient to overcome the lowest burden of proof by a preponderance of the evidence that the decedent, Marguerite L. Corsetti, and the plaintiff, Mario J. Segreti, had an implied contract for services, so there cannot be an oral contract to make a will. What cannot go unnoticed is the evidence of valuable services that Mrs. Corsetti rendered to Mario.

70.     In *Brown*, the court has set out the general requirements for obtaining recovery on a quantum meruit theory under a contract implied in fact:

> (1) valuable services must be rendered [by the plaintiff]; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid.

524 A.2d at 1190 (citations omitted).

71.     Mario testified that he talked with his grandmother in 1992 and 1993 about the terms of his proposed contract. He said in an affidavit that in 1992 there was already a "verbal contract" between he and his grandmother, that he was supposed to stay with her, help around the home, repair and maintain the house in exchange for ownership of the house when she died.

24

Yet he tried to explain in his testimony that the reason he remained silent while Mrs. Corsetti made a will in July of 1993 contrary to their agreement was because they were still working out the terms. Mario then testified that he raised the issue in 1997 about their agreement not being in writing. As he explained, Mrs. Corsetti's 1997 Will was the proof that they had a deal, or shall we say a contract.

72.    The Court recognizes that the remodeling efforts Mario undertook were valuable and that Mario had at times helped and cared for his grandmother. But it is difficult to reasonably infer from the evidence and testimony that that Mrs. Corsetti was aware that she was expected to pay for the things that Mario did for her and for the house, and that she was to pay by bequeathing her house, the largest asset she had, particularly when she provided a similar array of valuable services to his grandson.

73.    Mr. Wolf testified to Mrs. Corsetti's remark at the 1997 Will signing that Marie was not good with money and that she, Mrs. Corsetti, was devising the house to Mario because he earned it for taking care of her. The first part of her remark tends to corroborate Ms. Queen's testimony that Mrs. Corsetti was afraid of Marie's financial vulnerability at the time of her divorce and wanted to devise Marie's share through Mario, while the second part is not enough to discount the 1997 Will as an expression of Mrs. Corsetti's love or even gratitude for Mario such that she voluntarily decided to give a part or all of the house to him. The remark taken as a whole cannot be reasonably construed as Mrs. Corsetti knowing that she had an agreement to pay for Mario's services. Rather, this reflects a complex relationship between Mrs. Corsetti and Mario that fluctuating amongst the badge of affection reflected in Mr. Jenning's testimony, the dissatisfaction in believing that Mario and Anita trashed her memorable possessions, and her firm belief in family such that she would leave her property to family just because they are

10/19/2006 16:29 FAX                                                          @027

family.

74.    If Mrs. Corsetti had an agreement to pay Mario for his services, it would seem
unusual that she would do nothing but merely complain about the amount of time and her money
Mario spent on the various projects, some she did not even want, in excess of what she could
have paid a contractor who could have finished the work sooner.  Mario's friend described her as
a "pistol", yet she would allowed herself to be displaced from her bedroom for almost six years,
and allowed other unfinished projects to remain unfinished for extended periods of time.  This
evidence portrays more like a picture of a grandmother loving her grandson, a grandmother
willing to make concessions to her grandson at her own expense and discomfort.  By witnesses'
accounts, Mrs. Corsetti was someone who was mindful of how she spent her money.  Even
within the family, she was aware of what she spent on her son's medical bills; she was aware of
the loan she made to her daughter, Anita, and forgave it in writing; she worried about the impact
that her daughter, Marie's divorce and the closing of the Heller's Bakery might had on her estate.
It does not follow that if she and Mario had a contract, she would have been so casual about her
spending and the value she was receiving in return.

75.    Most of Mario's friends testified to a "deal" between Mario and Mrs. Corsetti.
Some said that it was Mrs. Corsetti saying that Mario would get the house; some said that it was
Mrs. Corsetti saying that she wanted to leave the house to Mario; and some said that it was
Mario saying that Mrs. Corsetti wanted to give him the house.  But Mrs. Corsetti also said Mario
deserved nothing more because she gave him a free place to live for 14 years, during which she
bought him groceries, washed his laundry, paid for his utilities and gave him money whenever he
was either unemployed or financially strapped.  Viewing the testimony collectively, it is more
credible that the nature of the "deal" was in the nature of a mutual understanding, as one witness

characterized, between a grandmother and a grandson whereby he lived in her house, helped her out and she helped him out.

76.     Perhaps at times Mrs. Corsetti felt magnanimous to give Mario a part of the house, but it was an act out of her own volition rather than an act to fulfill a contractual obligation.  Mario's witnesses testified that Mrs. Corsetti "wanted" to give the house to him, and that Mrs. Corsetti has said that it would be a "right thing" for her to give Mario the house for the many years he stayed with her.   Their testimony lends support to a belief that Mrs. Corsetti herself contemplated giving the house to Mario, and not because she had contract to do so. Mario's friend, Drake Russell, described Mrs. Corsetti "not a fraudulent person", that she would not commit fraud on Mario or anyone, so it would seem contrary that she would not perform her part of a "deal" or any sort of contract unless she was not aware of none.

77.     Mario may very well have believed that he was to get the house for his efforts, but his belief alone cannot be imputed on Mrs. Corsetti.  Mario has two degrees while Mrs. Corsetti had a high school degree.  Mario had negotiated the real property deal in 1997 for Mrs. Corsetti's farm, then co-owned a bakery and is now a stockbroker.  He said he had asked Mrs. Corsetti to put their agreement in writing, yet there was none.  Though family members are less likely to formalize contractual arrangements between themselves, Mrs. Corsetti knew the importance of forgiving a loan to her own daughter in a letter.  So again, the evidence is at odds why there was no writing memorializing such an important "deal".

78.     The totality of the circumstances does not support a finding that Mario has shown by a preponderance of the evidence that Mrs. Corsetti had reasonable notice in 1992, then in 1997 or at any time before her death that she was obliged to pay for whatever services Mario rendered.

79.     Mario's hurdles are insurmountable, he was not able to satisfy the Court that by a preponderance of the evidence he rendered services to his grandmother that were not of a gratuitous nature but rather a contract for remuneration. Yet had he met this showing, there is his failure to show by clear and convincing evidence that it was a contract for the specific performance that Mrs. Corsetti would devise her house to him alone.

80.     In adopting the preponderance of evidence standard for a claim of quantum meruit, the court in *Brown* left unanswered the question of the standard for "deal[ing] with the quantum of proof necessary to rebut the presumption of gratuity when a claimant attempts to obtain specific performance of an alleged contract for a particular piece of estate property in return for services rendered during the decedent's lifetime." 524 A.2d at 190, n.8.

81.     Mario cites to the Maryland case *Shives v. Borgman*, 69 A.2d 802, 805 (Md. 1949), for his support to enforcing an oral contract to devise real estate. "[A] court of equity should never be anxious to save an oral contract, especially a contract [for the devise of real estate,] from the operation of Statute of Frauds where there is any equivocation or uncertainty in the evidence. The terms of the contract must be clear and definite and must be affirmatively established by strong and convincing evidence." *Id.* The complainant in *Shives* lived with and cared for the decedent who was not ambulatory and whose need for a housekeeper was extremely urgent; the complainant was promised the decedent's entire estate and was otherwise not paid anything for the services she had rendered. In the instant case, Mrs. Corsetti cooked, cleaned and cared for Mario for 14 years, in turn he helped her around the house and assisted in remodeling the house; Mario was also given money, and received free room and board plus utilities. In marked contrast, the evidence here does not compare to *Shives* and is insufficient to justify Mario's entitlement to specific performance. Moreover, Mario was motivated, on the

28

unilateral hope that the house would someday be his.

82.     Accordingly, the Court finds no evidence that Mrs. Marguerite Corsetti breached an oral contract to will her house to Mario Segreti.  The Court finds that there was no agreement between Mrs. Corsetti and Mario whereby Mario was to render services in exchange for Mrs. Corsetti's promise to will her entire house to him.

<u>JUDGEMENT</u>

For the foregoing reasons, it is hereby ORDERED that:

Marguerite Corsetti, possessed testamentary capacity on February 27 and March 2, 2004;

Defendants Marie Arient, Antoinette Witt and Luke De Iuliis did not unduly influence the deceased, Marguerite Corsetti, in the making of the 2004 Will, the 2004 amended and restated Trust and the changing of co-ownership on the Bank of America account;

Plaintiff, Mario Segreti, and the deceased, Marguerite Corsetti, did not have an oral or written contract to will the real property located on 5113 Western Avenue, N.W., Washington, DC;

the Will of March 2, 2004 is declared the operative last Will and Testament of Marguerite Corsetti and is hereby admitted to probate.

It is SO ORDERED on this 16th day of October 2006.

Judge José M. López

Copies to:

29

Michael B. McGovern, Esq.
HANSON & MOLLOY
1320 Nineteenth Street, N.W., #300
Washington, DC 20036

Lois Goodman, Esq.
5712 Nebraska Avenue, N.W.
Washington, DC 20015

Antoinette Witt
654 Braemar Terrace
Fallbrook, CA 92028

Justin Corsetti
6301 Stevenson Ave., Apt. 1006
Alexandria, VA 22304

Damien Corsetti, PFC
US Army/Special Forces
A Co., 525 MI BN
Box 315
Ft. Bragg, NC 28380

Judge Duncan-Peters
Superior Court of the District of Columbia

Ashley E. Wiggins, Esq.
GRIFFIN & MURPHY, LLP
1912 Sunderland Place, N.W.
Washington, D.C. 20036

Charles S. Vizzini, Esq.
2025 I St., N.W.
Washington, DC 20006

Rose Marie Beckner
14724 Waterway Drive
Rockville, MD 20853

Marie-Antoinette Arient
4770 Topaz Street, Apt. 60
Las Vegas, NV 89121

MAILED from Chambers    OCT 1 7 2006

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARIO J. SEGRETI** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-00287-RBW** |
| | ) | |
| **A. MARK CHRISTOPHER, et al.** | ) | |

## <u>ORDER</u>

UPON CONSIDERATION of the Motion to Dismiss of Defendants A. Mark Christopher, Herge, Sparks & Christopher, LLP, Vaughan, Fincher & Sotelo, P.C., and J. Curtis Herge, it is this _____ day of _____, 2007,

ORDERED that the Motion is granted and this matter is dismissed with prejudice.

_____
Judge Reggie B. Walton,
United States District Court for the
District of Columbia